UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

ANTHONY M. GARRAWAY,

                              Plaintiff,

          v.                                          5:03-cv-0681


BROOME COUNTY, NEW YORK; RONALD J. BILL,
Chief Civil Deputy; BROOME COUNTY SHERIFF'S
DEPARTMENT; DENNIS ROWLANDS, Deputy #260;
and CHRIS SMITH, Deputy #223,

                              Defendants.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

THOMAS J. McAVOY
Senior United States District Judge

## DECISION and ORDER

## I.      INTRODUCTION

          Plaintiff commenced this action pursuant to 42 U.S.C. § 1983 alleging that

Defendants violated his Fourth Amendment right against unreasonable search and seizures

and his Fourteenth Amendment right to equal protection and due process. Defendants move

for summary judgement pursuant to Fed. R. Civ. P. 56 based on the untimeliness of

Plaintiff's claim and his failure to state a cause of action. Plaintiff opposes arguing his claim is

timely under the "prison mailbox rule" and that there are genuine issues of fact warranting a

trial.

## II.      BACKGROUND

Plaintiff claims that on or about May 15, 2000 he entered into an oral agreement with Esther Gardner for a "month-to-month lease" of a mobile home.  Plaintiff contends that he made a rent payment for the remainder of the month and was given "the only key to the property so he could move in." (Pl.'s Statement of Undisputed Facts at ¶ 1).  Gardner, however, states she never met or talked with Plaintiff prior to May 31, 2000 and that she did not lease any property to him. (Gardner Aff. ¶ 9.)  Gardner's daughter, Margaret Dunn, claims that Denise Houck, Plaintiff's then girlfriend, contacted her a few weeks prior to May 31, 2000 about renting the property. (Dunn Aff. ¶ 2.)  Dunn claims she and Houck had an oral agreement that Houck would not move in until she had paid Dunn the first month's rent and a security deposit.  Dunn gave Houck permission to fix the property up prior to moving in and gave Houck a key.  Dunn states she never intended to rent the property to Plaintiff, but rather to Houck and her children. (Dunn Aff. ¶ 8.)  No formal lease documents were drawn up.  There remains a factual dispute as to what rental agreements, if any, were made between Plaintiff, Houck, Gardner, and Dunn.

Dunn became aware that Houck had moved in without making any rent or security deposit payments. (Dunn Aff. ¶ 5. )  Dunn claims Houck told her she would have the rent money within the next few days and, upon that belief, Dunn allowed Houck to stay in the mobile home. Id.

On May 31, 2000, Gardner went to the mobile home and saw that Houck and Plaintiff had moved in and had pit bulls living on the property.  Gardner claims she no longer wanted Houck to lease the property and called the Broome County Humane Society and the Broome County Sheriff's Office to see what actions could be taken. (Gardner Aff. ¶ 5. )

When the Humane Society arrived, Plaintiff came outside from within the mobile home and an argument ensued between he and Gardner as to her request for the Humane Society to remove Plaintiff's dogs.  Shortly thereafter, Defendant Sheriff's Deputy Rowlands arrived on the scene and claims he was advised by Gardner that Plaintiff did not belong on the property. (Rowlands Aff. ¶ 3.)

Defendant Sheriff's Chief Civil Deputy Bill claims he responded to the scene after hearing a discussion of it on his radio.  Upon arrival, Bill claims he spoke with Gardner who advised him that, while Plaintiff and Houck were going to lease the property and had been given permission to do some work inside the home, they had not been given permission to move into the residence.  Bill claims Houck told him what Gardner said was true and that no money had exchanged hands and there was no formal lease agreement. (Bill Aff. ¶ 4.)  Bill claims that he then advised Houck that in his opinion she and Plaintiff were "not in the residence legally" and that they would ultimately have to leave.  Bill states that he advised Houck of the legal processes by which she could contest the landlord's representations. (Bill Aff. ¶ 4.)

Defendant Sheriff's Deputy Smith claims that upon his arrival, Rowlands was interviewing Plaintiff who stated his name was Hubert A. Garraway and was refusing to offer any form of identification.  Hubert Garraway is Plaintiff's brother. (Smith Aff. ¶ 3. )  Smith claims he was advised by the Humane Society employees that Plaintiff's name was Anthony Garraway and that they had a number of prior dealings with him. (Smith Aff. ¶ 4). Smith claims Plaintiff continued to give conflicting information as to his name, social security number and other identification information.  Smith states that just prior to placing Plaintiff into custody on suspicion of committing criminal impersonation, he was advised of an active

arrest warrant outstanding for Plaintiff from the Binghamton Police Department regarding a Criminal Mischief in the Fourth Degree charge. (Smith Aff. ¶ 6.)  Smith claims he never entered or searched the mobile home.

Because Defendants suspected Plaintiff was lying about his identity, Rowlands entered the mobile home to find a form of personal identification for Plaintiff.  Rowlands claims he entered the mobile home upon the belief that Plaintiff did not belong there and that Gardner had the authority to consent to the search. (Rowlands Aff. ¶ 8.)  Rowlands claims the search entailed "nothing more than glancing over any papers or documents that might have been lying around the residence." (Rowlands Aff. ¶ 7.)  Rowlands claims he did not remove any items from the property. Id.

Plaintiff offers a conflicting version of the events.  Plaintiff claims that Houck was not present and that she was at work during the entire incident.  Plaintiff admits he would not offer any form of identification to Defendants and that he stated he was Hubert.  Plaintiff claims Defendant Smith unlawfully entered the mobile home and returned with letters written and sent to Anthony Garraway.  Plaintiff claims Rowlands also unlawfully entered the mobile home, found Plaintiff's wallet within a pair of Plaintiff's pants and removed Plaintiff's license and social security card.  Plaintiff claims these identification cards were obtained from an illegal search and were illegally seized.  Plaintiff claims the identification cards were taken from the property to the station where Plaintiff was processed.

It is undisputed that Plaintiff was arrested and charged with Criminal Impersonation in the Second Degree (New York Penal Law §190.25) and Criminal Mischief in the Fourth Degree (New York Penal Law §145.00).  Following the incident, Gardner began a formal

eviction proceeding and posted a 3-day notice on the door of the mobile home.  Following the posting, Gardner believed no one remained in the mobile home. (Gardner Aff. ¶ 7.)

Plaintiff filed the instant claim pursuant to 42 U.S.C. 1983 claiming a violation of his Constitutional Fourth Amendment right against unreasonable search and seizures and a violation of his due process right for being evicted from the property.

## III.    STANDARD OF REVIEW

It is well settled that on a motion for summary judgment, the Court must construe the evidence in the light most favorable to the non-moving party, see Tenenbaum v. Williams, 193 F.3d 581, 593 (2d Cir. 1999), and may grant summary judgment only where "there is no genuine issue as to any material fact and ... the moving party is entitled to a judgment as a matter of law." FED. R. CIV. P. 56(c).  An issue is genuine if the relevant evidence is such that a reasonable jury could return a verdict for the nonmoving party. Anderson v. Liberty Lobby, 477 U.S. 242, 248 (1986).  A party seeking summary judgment bears the burden of informing the court of the basis for the motion and of identifying those portions of the record that the moving party believes demonstrate the absence of a genuine issue of material fact as to a dispositive issue.  Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).  If the movant is able to establish a prima facie basis for summary judgment, the burden of production shifts to the party opposing summary judgment who must produce evidence establishing the existence of a factual dispute that a reasonable jury could resolve in his favor.  Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986).  A party opposing a properly supported motion for summary judgment may not rest upon "mere allegations or denials" asserted in his pleadings, Rexnord Holdings, Inc. v. Bidermann, 21 F.3d 522, 525-26 (2d Cir. 1994), or on conclusory allegations or unsubstantiated speculation.

Scotto v. Almenas, 143 F.3d 105, 114 (2d Cir. 1998).  With this standard in mind, the Court will address Defendants' motion

## IV.      DISCUSSION

Plaintiff's Complaint alleges violations of his Constitutional right against illegal search and seizures by Defendants, and a violation of his Constitutional right to equal protection and due process by denying Plaintiff a legal eviction. (See Pl. Compl.).  Plaintiff claims there was an oral rental agreement between he and Gardner and, therefore, Gardner did not have the authority to consent to a search of the mobile home.  Plaintiff further claims Defendants threatened his family that if they were to return to the property they would be arrested for trespassing, thus resulting in an illegal eviction by Defendants. Defendants argue the Complaint should be dismissed because it is untimely under 42 U.S.C.S. §1983.  In addition, Defendants argue that the motion for summary judgment should be granted because no Fourth Amendment or due process rights have been violated and, assuming there was a violation, that they are entitled to qualified immunity.

A. Timeliness of Plaintiff's Claim

There is a three year statute of limitations for actions arising under 42 U.S.C. 1983. Plaintiff's claim arose from the incidents occurring on May 31, 2000.  Defendants claim the filing date of June 4, 2003 renders the Complaint untimely.  However, Plaintiff, in his position of being both *pro se* and incarcerated, is afforded protection by the "prison mailbox rule". This rule is justified under the rationale that in being *pro se* and incarcerated the plaintiff has no choice but to hand his notices to prison authorities to forward to the Court Clerk.  Because the plaintiff loses control over the documents and must therefore rely on prison authorities to

forward them on to the clerk, Courts have recognized the date plaintiffs hand over their documents to prison authorities as the effective "filing date", and not the date when the Court Clerk actually is in receipt of them. See Houston v. Lack, 487 U.S. 266 (1988).

In the instant case, while the filing date as entered by the clerk is June 4, 2003, Plaintiff appears to have handed the Complaint over to prison officials prior to May 31, 2003, and by virtue of the "prison mailbox rule", filed the Complaint within the three year statute of limitations.[1]

### B. Fourth Amendment right against unreasonable search and seizures

Plaintiff claims his Fourth Amendment right against unreasonable search and seizures was violated when Defendants Rowlands and Smith, without permission from Plaintiff, unlawfully entered into the mobile home and unlawfully seized Plaintiff's property.

To claim a violation of a Fourth Amendment right against unreasonable search and seizures, Plaintiff has to show a legitimate expectation of privacy in the property. California v. Ciraolo, 476 U.S. 207 (1986). A legitimate expectation may be shown by establishing an actual subjective expectation of privacy and that the expectation is one that society is prepared to recognize as legitimate. Id. Thus, "a tenant's expectation of privacy in his apartment ceases to be 'objectively justifiable' when his occupancy ceases to be lawful, as determined by the terms of his lease. . . ." U.S. v. Ross, 43 Fed. Appx. 751, 757 (6th Cir. 2002). In U.S. v. Allen, 106 F.3d 695 (6th Cir. 1997), for example, the court held a defendant

---

[1]Respondents may, however, inquire as to the date Plaintiff actually handed over the papers and later raise this issue if it should appear that Plaintiff handed over the papers after May 31, 2003.

lacked a legitimate expectation of privacy when he failed to remain current on his rental payments.

A search conducted without a warrant is considered per se unreasonable and, therefore, a violation of the Fourth Amendment unless the search falls within a specifically established exception. See Katz v. United States, 389 U.S. 347 (1967).  One such exception is a warrantless search conducted with consent. See Schneckloth v. Bustamonte, 412 U.S. 218 (1973).  "The Fourth Amendment recognizes a valid warrantless entry and search of premises when police obtain the voluntary consent of an occupant who shares, or is reasonably believed to share, authority over the area in common with a co-occupant who later objects to the use of evidence so obtained."  Georgia v. Randolph, — S. Ct. —, —, 2006 WL 707380, at *3 (Mar. 22, 2006).  Valid consent is established when one with actual authority over the property voluntarily gives consent to a search. Schneckloth, 412 U.S. 218. "[T]he exception for consent extends even to entries and searches with the permission of a co-occupant whom the police reasonably, but erroneously, believe to possess shared authority as an occupant."  Randolph, — S. Ct. at —, 2006 WL 707380 at *5.  Generally, a lessor of real property has no authority to consent to a warrantless search of rental property which is subject to an existing lease. See Chapman v. U.S., 365 U.S. 610 (1961); U.S. v. Elliott, 50 F.3d 180, 186 (2d Cir. 1995).  "A landlord does, however, have authority to consent to a search by police of dwelling units in his building that are not leased.  Further, if the landlord has joint access or control over certain areas of his apartment building for most purposes, he may validly consent to a search of those areas."  Id.

## 1. Actual Authority to Consent

The first issue is whether Plaintiff had actual authority over the mobile home as a result of a rental agreement.  Plaintiff claims there was an oral lease agreement with Gardner and that he paid rent for the month of May.  Gardner claims she never made such an agreement and never received any payments from Plaintiff.  Dunn claims she and Houck had an oral lease agreement but that she was not authorized to live there yet and had made no rental payments.  Based on the foregoing, there is a material dispute as to whether there was a lease agreement in effect at the time of the search and whether rental payments had been made.  As a result, it remains unclear as to whether Plaintiff or Gardner had actual authority over the mobile home and was, therefore, authorized to give or refuse consent to the warrantless search.

## 2. Apparent Authority to Consent

Viewing the evidence in the light most favorable to Plaintiff, the Court will assume there was a valid lease agreement.  Nevertheless, the Court finds that the search of the mobile home was still valid under Illinois v. Rodriguez, 497 U.S. 177 (1990) and the Supreme Court's more recent decision in Randolph.  In Rodriguez, the Supreme Court held that law enforcement was permitted to conduct a search upon the apparent authority of a third party's consent, even if it turns out the third party did not in fact have actual authority. Rodriguez, 497 U.S. 177.   Law enforcement may rely on the third party's consent so long as facts available to the officer at the time of the search would warrant a "person of reasonable caution in belief that consenting party had authority over premises." See U.S. v. Perez, 948

F.Supp. 1191 (S.D.N.Y. 1996); see also Anderson v. Decristofalo, 494 F.2d 321 (2d Cir.
1974); Issa v. City of Glencoe, 118 Fed. Appx. 103 (8th Cir. 2004).

      Here, the issue is whether Officer Rowlands had a reasonable good faith belief that
Plaintiff was not on the property legally and was not there pursuant to a lease agreement
and, therefore, Gardner had the authority to consent to a warrantless search of the mobile
home.  Plaintiff claims that because the Officers were allegedly called to the scene because
of the pit bulls, and not for a landlord/tenant dispute, their belief that Plaintiff had no legal
right to be in the mobile home was unreasonable. Plaintiff claims Houck was not at the scene
and Defendants could not therefore rely on her statements in determining if Plaintiff was in
the mobile home legally.  Defendants Smith, Rowlands and Bill claim that once each had
arrived on the scene they were advised by Gardner that Plaintiff and Houck had moved into
the mobile home without having permission to do so. (Smith Aff. ¶ 12, Rowlands Aff. ¶ 3, Bill
Aff. ¶ 3.)  Defendant Bill claims Houck was at the scene and advised him that what Gardner
had said was true and that no formal lease agreement had been made and no money had
exchanged hands. (Bill Aff. ¶ 4.)  Irrespective of why Defendants arrived at the scene,
according to their affidavits, it was clear that once they arrived they were dealing with a
potential trespassing issue.

      Looking at the evidence in the light most favorable to Plaintiff, the Court will
assume that Houck was not present.  Similar to Elliott and Decristofalo, Gardner's
statements to Defendant Bill could cause a reasonable officer to conclude that Plaintiff was
not legally living in the property and that he was, as Defendant Bill concluded, either
squatting or trespassing on the property. (Bill Aff. ¶ 5.)   While Plaintiff claims he was

objecting to the search and that he had a legal right to be there, Plaintiff also admitted to lying to Defendants about his true identity, for which he was charged with Criminal Impersonation in the Second Degree (NYS PL §145.00). (Smith Aff. ¶ 7, Garraway Aff. ¶ 12.) Plaintiff's continued conflicting answers to Defendants concerning his true identity gave them reasonable doubt as to his credibility in general. Therefore, this Court finds Defendant Rowlands' reliance on Gardner's representations that Plaintiff did not belong in the home, that there was not an oral lease agreement between she and Plaintiff, and that she was the true owner of the residence with authority to consent to a search thereon, was reasonable against Plaintiff's assertions. Based on the circumstances, Defendant Rowlands believed Gardner had authority to consent to the search and he searched the mobile home for information concerning Plaintiff's identity.   While Plaintiff claims Smith took personal letters written by Plaintiff from the home as evidence of Plaintiff's true identity, Defendant Smith claims he never entered the mobile home. Looking at the evidence in the light most favorable to Plaintiff, and assuming that Defendant Smith searched the home as Plaintiff claims, Defendant Smith was privy to the same information that Defendant Rowlands relied on in searching the home. See Morgan v. Superintendent, 88 F.Supp.2d 312, 318 (S.D.N.Y. 2000) ("[W]here law enforcement authorities are cooperating, the knowledge of one is presumed shared by all..." and "[t]he determination of whether probable cause to [act] exists can be based on the collective knowledge of all the officers involved...".). Therefore, even if Defendant Smith did search the home it was based on the reasonable belief that Gardner had authority to consent to the search.

Because entry into the mobile home by Defendants was valid upon either the actual or apparent authority to consent by Gardner, the Court finds a "good faith defense" is

available to Defendants who may or may not have been deceived as to who held the true

legal interest in the home.  If Plaintiff never had a lease agreement with Gardner (oral or

written) or if Houck had an oral agreement with Dunn[2] but was not yet authorized to live

there, then Gardner provided actual authority to consent to the search.  Assuming there was

an oral agreement between Houck and Dunn or between Plaintiff and Gardner, Defendants

had reasonable grounds upon which to believe there was not a valid lease agreement and,

therefore, that Gardner retained authority to consent to a search of the premises.  Therefore,

Plaintiff's claims of violations of his Fourth Amendment rights are dismissed.

C. Due Process Rights

Plaintiff next claims his Constitutional rights to equal protection and due process

were violated when Defendants denied him the right to a legal eviction and the right to a fair

trial and hearing before a judge to determine a civil dispute. (Pl. Complaint ¶ 5.)  Plaintiff

alleges Defendant Bill told him "he was kicking me and my family out of the residence at the

request of the landlord and that if I ever returned he would personally arrest me." (Garraway

Aff. ¶ 24.)  Plaintiff claims Bill's threat of arrest was an act of illegal eviction, thereby denying

him the right to a legal eviction by Gardner.  Defendant Bill claims he never spoke with

Plaintiff that day and that at no time did he threaten Plaintiff or Houck that they would be

arrested if they did not leave. (Bill Aff. ¶ 6.)  Bill claims that he believed Plaintiff and Houck

were squatting or trespassing and, therefore, he advised Houck that she and Plaintiff were

not there legally.  Bill claims he advised Houck of the process by which she could contest

---

[2] There is no indication in the record that any agreement between Houck and Dunn contemplated
Plaintiff living in the mobile home.  Similarly, there is no evidence in the record that, assuming Houck was
legally residing in the mobile home, she permitted Plaintiff to reside there.

Gardner's representations and told her how she could get an order by the town court to allow her to stay.

A wrongful eviction action can be brought against law enforcement officals who are accused of evicting tenants for the landlord. See Collum v. Incorp. Village of Freeport, 691 F. Supp. 637, 641 (E.D.N.Y. 1998).  The court held in Collum that "where an officer, without an eviction warrant, gives a tenant a choice between absenting himself from the premises and being arrested and the tenant chooses the former, a wrongful eviction has taken place. [However]...a finding [that the officer] threatened arrest alone would be insufficient...the jury would have to find that the threat forced plaintiff to choose between vacating the premises and being arrested." Id.

Here, the issue is whether Defendant Bill evicted Plaintiff.  The answer is that he did not.  Plaintiff was removed from the premises based on an arrest unrelated to his presence in the mobile home (i.e., the warrant and criminal impersonation).[3]  Taking the evidence in the light most favorable to Plaintiff, even if Defendant Bill did threaten to arrest Plaintiff if he was to return to the property, as discussed above, Defendants had a reasonable good faith belief that Plaintiff and Houck were not there legally and, therefore, were trespassing.  Any remarks Defendant Bill may have made to Plaintiff or Houck in regards to arrest were warranted as he had a good faith belief that Plaintiff was engaged in the unlawful act of squatting or trespassing.  In addition, in accordance with Collum, mere

---

[3] According to Plaintiff's version of the facts, Houck was not at the mobile home during the incident and she, therefore, would not have been subjected to removal or arrest.  Even if Houck was present, as Defendants claim, Houck was not required to leave the home while the Defendants were there and was left at the home upon their departure. (Bill Aff. ¶ 7, Smith Aff. ¶ 13, Rowlands Aff. ¶ 3).  In addition, there is insufficient evidence that Houck's ultimately left the mobile home as a direct result of any alleged threats of arrest made by Defendants.

threats of arrest are insufficient to claim wrongful eviction. <u>Collum</u>, 691 F. Supp. 637. Bill had independent grounds upon which to arrest Plaintiff and remove him from the property. Therefore, Plaintiff's claim of a violation of his due process rights by an unlawful eviction of his family by Defendants is supported by insufficient evidence.

### D. Qualified Immunity

As a general rule, police officers are entitled to qualified immunity if their conduct "does not violate clearly established constitutional rights, or it was objectively reasonable for them to believe their acts did not violate those rights." <u>Oliveira v. Mayer</u>, 23 F.3d 642, 648 (2d Cir. 1994). Stated another way, officers are entitled to qualified immunity from liability for violating a plaintiff's civil rights unless it was "clear to a reasonable officer that his conduct was unlawful in the situation he confronted." <u>Groh v. Ramirez</u>, 540 U.S. 551, 563 (2004).

As discussed above, this Court finds it was objectively reasonable for Defendants to believe their actions were not in violation of Plaintiff's constitutional rights.  The Court therefore finds Defendants are entitled to qualified immunity.

### G. <u>Municipality Liability</u>

Lastly, Plaintiff claims Broome County is liable for the alleged Constitutional violations by Defendants through its failure to properly train Defendants. Defendants argue Plaintiff has not shown a custom or policy adopted by the municipality which caused the alleged violations.

In §1983 claims, municipalities may not be held responsible under a theory of *respondeat superior*. <u>Board of the County Commissioners of Bryan County, Oklahoma v. Brown,</u> 520 U.S. 397 (1997).  To impose liability onto a municipality the plaintiff must identify

a municipal "policy" or "custom" that caused plaintiff's injury.  Id. (citing Monell v. New York City Dept. of Social Servs., 436 U.S. 658, 694 (1978)).  An act performed pursuant to a "custom" may subject a municipality to liability on the theory that the practice is so widespread so as to have force of law.  Brown, 520 U.S. at 404.  One way to show a custom or policy has been adopted by the municipality is to prove the municipality failed to properly train defendants.  In order to show failure to train by a municipality, the plaintiff must "identify a specific deficiency in the city's training program and establish that the deficiency caused a deprivation of his constitutional rights." City of Canton,Ohio v. Harris, 489 U.S. 378, 391 (1989).  Here, Plaintiff claims, "Broome County Sheriff Department failed to train [Defendants]." (Pl. Mem. in Opp'n. to Def. Mot. Summ. J., 9).  Plaintiff further claims "[a]nytime Defendant Bill is called to a similar civil dispute. . . he will always threaten and illegally evict the tenant." Id.  Plaintiff's conclusory allegations are insufficient to show specific deficiencies in the municipalities training program that resulted in the alleged violations of his rights.  As a result, Plaintiff has failed to provide sufficient evidence to show an ongoing, widespread policy or custom of the municipality to violate citizens' Fourth and Fourteenth rights.  Therefore, Plaintiff's claim against Broome County is dismissed.

## IV. CONCLUSION

For the reasons stated above, Defendant's Motion for Summary Judgment is GRANTED and Plaintiff's action is DISMISSED.

IT IS SO ORDERED.

Dated:   April 7, 2006

Thomas J. McAvoy
Senior, U.S. District Judge